## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) KENNA BUNDY, as Personal representative of the Estate of Kayla Turley, Deceased,<br><br>       Plaintiff,<br><br>vs.<br><br>(1) SHERIFF OF GARVIN COUNTY, IN HIS OFFICIAL CAPACITY,<br>(2) TURN KEY HEALTH CLINICS, LLC,<br>(3) LYNNSEE NOEL, LPN<br>(4) JENNIFER BAXTER,<br>(5) MELISSA MELTON,<br>(6) ALESHA INGRAM,<br>(7) PAULA KELLEY,<br>(8) VINCENT MATTHEWS<br><br>       Defendants. | Attorney Lien Claimed<br>Jury Trial Demanded<br><br>CASE NO.: |

## COMPLAINT

**COMES NOW**, the Plaintiff Kenna Bundy ("Plaintiff"), as Personal Representative of the Estate of Kayla Turley ("Ms. Turley"), deceased, and for her Complaint against the above-named Defendants, states and alleges as follows:

## INTRODUCTION

1.        In August 2023, Kayla Turley had the misfortune of being a pretrial detainee at the Garvin County Detention Center (the "Jail"). She was transported to Chickasaw Medical Center because she was experiencing abdominal pain and other symptoms. Before releasing Ms. Turley back to the custody of the Jail on August 4, a physician at the hospital cautioned detention staff employed by the Garvin County Sheriff's Office ("GCSO") and

medical personnel employed by Defendant Turn Key Health Clinic, LLC ("Turn Key") that Ms. Turley could have "a serious problem requiring surgery." The doctor emphasized the importance of monitoring Ms. Turley carefully and returning her to the emergency room if her symptoms worsened – including if her pain became more severe – providing the following explicit discharge instruction: **"RETURN WITH ANY WORSENING CONCERNS**" (emphasis in original). The physician also prescribed Ms. Turley an antibiotic to protect her against a potential infection.

2.      As surveillance video from the Jail shows in horrific detail, over the following 48 hours Ms. Turley's condition deteriorated sharply. Her pain became unbearable, leaving her moaning, begging for help, and ceaselessly crying out. By August 5, she needed assistance dressing herself and going to the bathroom. By August 6, she had lost control of her bowels, repeatedly defecating on herself. She could not walk on her own and repeatedly fell. She lost the ability to verbalize or communicate.

3.      Jail and Turn Key staff (a lone, low-level and unsupervised Licensed Practical Nurse ("LPN")) were aware of Ms. Turley's decline and her obvious signs of severe distress. Yet despite the hospital physician's explicit, repeated instructions that "***should she have any new or worsening symptoms, [ ] return her to the emergency department***...," they did not call an ambulance or even arrange for her to be seen by any qualified medical personnel.

4.      Instead, they refused to even give Ms. Turley the prescribed antibiotic she needed to fight the infection that was spreading within her and attacking her vital organs. Making matters much worse, detention and medical staff convinced the inmates who

shared Ms. Turley's cell that she was faking her symptoms. Some of those inmates – frustrated by Ms. Turley's moaning in pain and angry that they had helped clean her feces – began verbally abusing and physically assaulting her. Detention and medical staff alike witnessed this abuse via the Jail's video surveillance system. But rather than intervening to protect Ms. Turley, they encouraged the abuse and violence. At one point, a detention officer told the inmates there would be a "glitch" in the camera system that would allow them to harm Ms. Turley without being observed.

5.     This is deliberate indifference in the extreme. GCSO and Turn Key staff's appalling conduct produced "physical torture or a lingering death…, the evils of most immediate concern to the drafters of the [Eighth] Amendment…." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

6.     Shortly after midnight on August 7, a police officer who was at the Jail on other business looked in on Ms. Turley and – seeing her condition – insisted on going in to check on her. He found her unresponsive, lying on the concrete floor with "blood and white foam coming out of her mouth."

7.     After suffering two days of inhumane neglect and unfathomable mistreatment, Ms. Turley was finally taken to a hospital. But by then, it was too late. She died from multisystem organ failure.

8.     Following an investigation by the FBI, in December 2024 a federal grand jury returned an indictment charging five GCSO and Turn Key staff members – all Defendants herein – with criminal violations of Ms. Turley's civil rights. If convicted, each faces a maximum sentence of life in prison.

9.     These violations of basic human rights and contemporary standards of decency did not happen in a vacuum. Ms. Turley suffered and died as a result of an unconstitutional medical delivery system. She suffered and died as a result of gross deficiencies in staffing and procedures. She suffered and died as a result of GCSO and Turn Key's failure to staff the medical unit with qualified professionals, failure to provide access to a physician, and failure to supervise a Jail's medical delivery system.

10.     This suit seeks accountability for the systemic, deliberate indifference of GCSO, Turn Key, and the multiple individual staff members who callously allowed Ms. Turley to suffer a torturous – and easily avoidable – death.

## **PARTIES**

11.     Plaintiff Kenna Bundy, as Personal Representative of the Estate of Kayla Turley, deceased, is a citizen of the State of Oklahoma and Personal Representative of Ms. Turley's Estate. Kayla Turley was Plaintiff's sister.

12.     Defendant Sheriff of Garvin County, Oklahoma ("Sheriff") is the Sheriff of Garvin County, Oklahoma, residing in Garvin County, Oklahoma and acting under color of state law. The Sheriff is sued purely in his official capacity.  It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014).  Thus, in suing the Sheriff in his official capacity, Plaintiff has brought suit against the County/Garvin County Sheriff's Office ("GCSO").

4

13.     Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Garvin County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including Oklahoma County, to provide medical professional staffing, supervision, and care in county jails. Turn Key was, at times relevant hereto, responsible, in part, for providing medical services, supervision, and medication to Ms. Turley while she was in custody at the Garvin County Detention Center (the "Jail"). Turn Key was also responsible, in part, for creating, implementing, and maintaining policies, practices, and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees. Turn Key was endowed by Garvin County/GCSO with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional obligations.

14.     Defendant Lynsee Noel, LPN, is, upon information and belief, a citizen of Oklahoma. Noel was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/GCSO/Garvin County. Noel was, in part, responsible for overseeing Ms. Turley's health and well-being, and ensuring that Ms. Turley's medical needs were met, during the time she was in the custody of the Jail/GCSO. Noel is being sued in her individual capacity.

15.     Defendant Jennifer Baxter is, upon information and belief, a citizen of Oklahoma. Baxter was, at all times relevant hereto, acting under color of state law as an employee and/or agent of GCSO/Garvin County. Baxter was, in part, responsible for overseeing Ms. Turley's health, safety, and well-being, and ensuring that Ms. Turnley's

medical needs were met, during the time she was in the custody of the Jail/GCSO. Baxter is being sued in her individual capacity.

16.     Defendant Melissa Melton is, upon information and belief, a citizen of Oklahoma. Melton was, at all times relevant hereto, acting under color of state law as an employee and/or agent of GCSO/Garvin County. Melton was, in part, responsible for overseeing Ms. Turley's health, safety, and well-being, and ensuring that Ms. Turnley's medical needs were met, during the time she was in the custody of the Jail/GCSO. Melton is being sued in her individual capacity.

17.     Defendant Alesha Ingram is, upon information and belief, a citizen of Oklahoma.  Ingram was, at all times relevant hereto, acting under color of state law as an employee and/or agent of GCSO/Garvin County. Ingram was, in part, responsible for overseeing Ms. Turley's health, safety, and well-being, and ensuring that Ms. Turnley's medical needs were met, during the time she was in the custody of the Jail/GCSO. Ingram is being sued in her individual capacity.

18.     Defendant Paula Kelley is, upon information and belief, a citizen of Oklahoma. Kelley was, at all times relevant hereto, acting under color of state law as an employee and/or agent of GCSO/Garvin County. Kelley was, in part, responsible for overseeing Ms. Turley's health, safety, and well-being, and ensuring that Ms. Turnley's medical needs were met, during the time she was in the custody of the Jail/GCSO. Kelley is being sued in her individual capacity.

19.     Defendant Vincent Matthews is, upon information and belief, a citizen of Oklahoma. Matthews was, at all times relevant hereto, acting under color of state law as

an employee and/or agent of GCSO/Garvin County. Matthews was, in part, responsible for overseeing Ms. Turley's health, safety, and well-being, and ensuring that Ms. Turnley's medical needs were met, during the time she was in the custody of the Jail/GCSO. Matthews is being sued in his individual capacity.

## JURISDICTION AND VENUE

20.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of State law.

21.    This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

22.    The acts complained of herein occurred in Garvin County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## STATEMENT OF FACTS

23.    In July and early August of 2023, Kayla Turley was a pretrial detainee at the Jail.

24.    On August 4,  Ms. Turley was transported to Chickasaw Medical Center because she was experiencing abdominal pain and other symptoms. Medical personnel

could not make a definitive diagnosis: "There are many causes of abdominal pain. ***Pain can mean a serious problem requiring surgery***... Often, time must pass to determine the cause of the pain."

25.    Before discharging Ms. Turley to be returned to the Jail, the hospital's physician repeatedly emphasized to Jail and Turn Key staff the importance of watching Ms. Turley closely and instructed them to return her to the emergency department immediately if her symptoms worsened. The physician stated, "Surgery was consulted to recommend starting the patient on antibiotic and follow-up in the surgery clinic." The physician further instructed that "***should she have any new or worsening symptoms, to return her to the emergency department***... Patient have close follow-up with the surgery clinic or sooner with the emergency department for any new or worsening symptoms."

26.    The hospital physician's discharge instructions repeated these requirements and emphasized them in bold, all-caps lettering, stating:

> Things may change within the next 24 hours. Call the doctor or come back for re-examination if any problems occur, such as: (1) Pain that becomes more severe, steady, or becomes concentrated in one specific area. Also, pain that is more severe with movement... (7) Failure to improve as expected... **[Y]ou should return if there is unexpected worsening or a significant change in your symptoms... RETURN WITH ANY WORSENING CONCERNS.**

(emphasis in original).

27.    At the hospital, Ms. Turley was also given a prescription for Amoxicillin, an antibiotic, with instructions to "take 1 tablet by mouth twice a day until all taken for

infection." The prescription instructed that Ms. Turley should receive the antibiotic for the next 7 days.

28.     But video surveillance shows that when Ms. Turley's symptoms worsened alarmingly, Turn Key and Jail staff took no action to help her or to seek proper medical care for her. Instead, they repeatedly refused to return Ms. Turley to the hospital as instructed, purposefully refused to give her her prescribed antibiotic, and encouraged her fellow cellmates to physically assault her.

## MS. TURLEY'S FINAL DAYS

29.     Ms. Turley returns to the Jail just after 8:00 PM on August 4. She is placed in Cell #8, a video-monitored cell that looks like a dungeon. Paint is peeling off the walls. Sixteen beds are crammed into a room that, according to Oklahoma Jail Standards, is only fit to hold 10 inmates at most. As a result, Ms. Turley would soon find herself lying on a mat on the floor as she died.

30.     On the night of August 4, Ms. Turley is walking under her own power. But within hours, her condition has deteriorated significantly. Now she needs assistance to sit up in bed. During the night, another inmate helps her walk from her bunk to the toilet in the cell.

31.     At 4:24 AM on August 5, Detention Officer ("DO") Paula Kelley brings breakfast to the inmates in Cell #8. Ms. Turley does not get up to get food. Throughout that morning, other inmates repeatedly help Ms. Turley with simple tasks like walking across the tiny cell, using the toilet, and getting dressed. She is so weak that she needs their

assistance to pull her pants up after using the toilet. One inmate helps her put on her shirt. Others put a blanket on her after assisting her back to her bed.

32.     During this time, Jail staff come to the cell repeatedly, sometimes interacting with Ms. Turley. Although her symptoms have worsened, they take no action to assist her.

33.     At 9:35 AM, DO Alesha Ingram is standing at the door to Cell #8, looking in at the inmates. Ms. Turley is crying, "Help! I just really need something." Ingram asks, "What's going on, Turley?" Ms. Turley responds, ***"I need help."*** One inmate explains, "She's been hollering for her sister and her mama. She says she needs help. And when we ask her, 'What do you need help with?' she just says she's don't know. She don't even remember the doctor's appointment." Another inmate tells Ingram, "Listen, we've been making her drink water. We've been making her eat a little bit. And ***it's getting worse***. We love her to death but we don't know what to do for her."

34.     DO Ingram does not call a physician, EMS, or even a nurse. She simply walks away. Although a hospital physician has told Jail and Turn Key staff that Ms. Turley may have a serious condition, must be closely monitored, and must be returned to the emergency room if her symptoms worsen, no one checks on Ms. Turley.

35.     Hours pass and Ms. Turley's condition grows worse. At 4:36 PM, DO Kelley arrives at Cell #8 to serve meals. While the other inmates line up to receive their food, Ms. Turley does not stir. Although DO Kelley shows no concern for whether Ms. Turley eats, a fellow inmate rouses her. With Kelley at the cell door, Ms. Turley is crying out in pain, saying, ***"help me."*** Ms. Turley stumbles from her bed to the door. Although it is only a

walk of a few steps, **Ms. Turley falls on her way to the door. Rather than checking on her or calling a nurse, DO Kelley merely gives Ms. Turley a tray.**

36.    Throughout the day of August 5 and into the night, Ms. Turley's fellow inmates continue to help her get to the toilet, pull her pants up, and return her to bed. They bring her water and place a blanket on her. Detention officers repeatedly look into Cell 8 and talk with inmates during these hours, but – unlike the inmates – they do nothing to seek help for Turley.

37.    At 1:28 AM on August 6, the inmates in Cell #8 are screaming at Ms. Turley to shut up. She has been moaning constantly in pain and has needed assistance for her basic needs, like going to the toilet. DO Melton comes to the door of the cell. Instead of seeking medical attention for Ms. Turley, she states, "You need to be quiet. **We understand that you are in pain.**" She then orders Ms. Turley to get dressed so that she can be moved out of the cell. Later, DO Baxter will document that Ms. Turley was removed from Cell #8 "due to the females in cell 8 stating that she was being annoying..."

38.    Ms. Turley is unable to move. She begs for help. Because she is unable to dress herself, an inmate helps get her clothes on. Ms. Turley cries in pain when she is touched.

39.    DO Melton is watching through the cell door. She hears Ms. Turley's cries and sees that she cannot dress herself. She sees that Turley needs assistance just to stand. She watches as an inmate helps Turley walk the few steps from her bunk to the cell door. Yet she does *nothing* to help her or to seek medical attention for her. Instead, she simply takes Turley down the hall to lock her into Cell #3 – a small, video-monitored cell that

appears intended for solitary confinement. However, when Ms. Turley is brought to the cell, it already houses another inmate named Breanna Lyons.

40.    Before entering Cell #3, Ms. Turley stumbles. She stumbles again upon entering the cell. Again, she is clearly and obviously in need of emergent medical attention. Unlike DO Melton, who takes no action to care for Ms. Turley, inmate Lyons immediately jumps up to help her, asking "Are you ok?" For the next **_six (6) hours_**, as Ms. Turley's condition continues to deteriorate, the only care she will receive will come from Ms. Lyons, a fellow inmate. Unlike the Turn Key LPN and every detention officer at the Jail, Ms. Lyons shows genuine concern for Ms. Turley. Throughout the night, she expresses her sympathy for Ms. Turley's obvious medical distress, seeks to sooth and comfort Turley, attempts to help her eat, and helps her use the toilet.

41.    Lyons tells Ms. Turley, "I'm sorry you're having to go through this." Ms. Turley can only moan, **_"ow.. the pain.. ow… pain… oh god… I don't know what to do… I need help… Oh no… oh god, oh god…"_** Lyons places a blanket on her, offering the only comfort she can.

42.    At 2:32 AM, DO Melton opens the window on the door to Cell #3. She sees Ms. Turley lying in fetal position. The top of her body is on the mat on the floor, but her lower half has slid off the mat. **_Ms. Turley moans loudly – urgently – "oh god! Ow… help! Help, please!" Yet again, DO Melton does nothing to check on her or seek medical assistance for her. She simply walks away and writes in the Jail's logbook, "sight check completed."_**

43.     At 4:26 AM, DO Melton returns to Cell #3. She puts a tray of food through the tray slot in the door. She hears Ms. Turley moaning in pain, saying, "I can't do this... ow!  I just can't do this..." Once again, DO Melton does *nothing* to assist Ms. Turley. She merely drops off the trays and walks away. She logs, "sight checks completed when passing out trays."

44.     Inmate Lyons tries to help Ms. Turley eat and to drink some coffee, telling Turley, "I hate to see you in pain."

45.     At 4:57 AM, Ms. Lyons helps Ms. Turley to stand up. Ms. Turley's condition has clearly grown even more dire during the hours she has spent in Cell #3. ***She cannot get up or even remain standing on her own. Although the toilet is nearly within arm's reach of her mat, she cannot walk to it on her own.*** Instead, Ms. Lyons helps her to the toilet. She asks Ms. Turley to pull her own pants down, but Turley cannot manage even this most simple task. Eventually, Lyons pulls Ms. Turley's pants down for her. Ms. Turley cannot sit down on the toilet by herself, so Ms. Lyons helps lower her down.

46.     When Ms. Turley is finished using the toilet, Ms. Lyons tells her she needs to wipe herself, and that she will then help Ms. Turley pull her pants up. But ***Ms. Turley cannot even wipe herself.*** Reluctantly, Lyons helps Ms. Turley stand and pulls her pants up. Although Lyons has urged Ms. Turley to wash her hands – saying she does not want Ms. Turley to become even sicker – it is clear that Ms. Turley cannot manage this basic task either. So Lyons helps Ms. Turley make the two-step journey from the toilet back to her mat and helps her down to the floor.

*47.*    As Ms. Turley's cries grow more urgent, at 6:40 AM Ms. Lyons goes to the window of Cell #3 and calls out to DO Melton repeatedly. Eventually she calls out, "Somebody? Anybody?" *No help arrives.*

48.    At 6:57 AM, DO Ingram opens the window on the door. At this point, Ms. Lyons has been deprived of a night's sleep. She has been locked in a tiny cell with a woman who is obviously in severe distress and has moaned in pain ceaselessly throughout the night. Lyons says to DO Ingram, "I cannot deal with this... goddamn... I cannot take it no more." DO Ingram responds, "I know. I believe you." Ingram can hear Ms. Turley crying in pain inside the cell. **DO Ingram tells Ms. Lyons, "We know that she hurts, but…" Lyons tells Ingram, "I've been helping her go to the bathroom and everything."** In response to Ms. Turley's cries – and the news that she is unable to even use the toilet on her own – Ingram does not check on her or call for medical assistance. Instead, DO Ingram suggests to Lyons that Ms. Turley is faking her symptoms, stating "Listen, if she can get up out there, she can get up in here."

49.    At 7:17 AM, DO Ingram returns to Cell #3 and says to Turley, "Do you want your meds –  yes or no?... **If you want your meds you're gonna have to get up… We're not coming in there if you don't get up." Turley cannot get up.** She merely moans, "Oh god... ok..." as she has been doing for hours.

50.    DO Ingram says to Turley, "Do you want your meds – yes or no?" Turley responds, "Yes." Ingram answers, "Then get up and get some water. Come on." Turley answers, "ok" but she cannot move.

51.    Inmate Lyons tells Ingram, "I gave her some water earlier... but I don't know if she will get up and get it." Rather than helping Ms. Turley or seeking medical assistance for her, DO Ingram responds, "you're gonna have to get up and get it to get your meds." With Ingram at the cell door with the tray slot open, Turley is moaning involuntarily as she has been for hours. Lyons tells DO Ingram, "she's been sitting here talking to herself this whole time." Ingram merely says, Ingram: ***"if you want your meds you're gonna have to get up… We're not coming in there and helping you*** up. You're gonna have to get up and come get your meds." But Ms. Turley cannot get up.

52.    The doctor who examined Ms. Turley at the hospital on August 4 had expressly warned Jail and Turn Key staff that "[p]ain can mean a serious problem requiring surgery" and "should she have any new or worsening symptoms... return her to the emergency department." That same physician had given Ms. Turley a prescription for antibiotic medication. Yet less than 36 hours later – when Turley is writhing in pain and unable to stand – DO Ingram not only does not take her to the emergency room, but ***refuses to give Turley her antibiotic***. Instead, she states, "You got up and went to the bathroom twice yourself yesterday. You're going to have to get up." DO Ingram walks away, leaving Turley moaning and crying in pain.

53.    Despite being expressly informed that Ms. Turley has a serious medical condition that requires care and treatment, Turn Key LPN Lynnsee Noel likewise acts with deliberate indifference toward Ms. Turley's need for emergent care. ***LPN Noel notes in her chart, "Patient refused to stand up" and "Patient refused to get up to take her meds this morning."*** Inevitably, the complete refusal of LPN Noel to address Ms.

Turley's obvious medical needs – or even simply to give her her prescribed antibiotic – let her untreated infection continue spreading throughout her body.

54.    Jail staff had placed inmate Lyons in Cell 3 as a punishment for yelling at DO Baxter the previous day. As a result, at this point Lyons has been locked all night in a tiny cell with an extremely sick inmate who has been moaning and crying in pain for hours. Unlike Jail staff or Turn Key's nurse, inmate Lyons has been providing assistance to Ms. Turley – helping her use the toilet, helping her onto her mat, soothing her, and replacing her blanket. Deprived of sleep all night – and told by guards that there is nothing wrong with Ms. Turley – Lyons finally loses patience with her. She tells Turley:

> I got so much patience but I do not go no patience no more. ***This is not my job to take care of nobody****...* ***You need to get up to get this medicine… If you don't you're going to get sicker*** and that's not my problem. At this point I don't care if you get sick and die. I want to go to sleep... ***I'm sorry you're that bad off, but … they don't believe you…***

55.    When DO Baxter returns to the cell, Lyons tells her, "I'm sorry for yelling at you." DO Baxter responds, "next time you'll stay here for the remainder of your stay. I'm not the one to fuck around with. You should know this by now."

56.    DO Baxter says to Ms. Turley, "Do you want your meds? If you do, you gotta get up and come get them." Turley responds, "I'm trying" but she clearly cannot get up. DO Baxter responds, ***"We know you're playing. There ain't nothing wrong with you until someone comes around.*** You need to get the hell up and come get your medicine if you're gonna do it and quit laying there... ***Get the hell up.***" Turley moans, ***"Can't someone please help?"*** DO Baxter does not help her. Like Turn Key LPN Noel and every other detention officer, she closes the window and walks away.

57.    At 7:45 AM, DO Baxter and Turn Key LPN Noel begin removing Ms. Turley from Cell #3 to place her back in Cell #8. When Baxter opens the door, Turley is crying out, "help... help..." and moaning. She is unable to stand. Instead of calling an ambulance, or even checking her vital signs, DO Baxter and LPN Noel offer her no care at all. Instead, with LPN Noel standing by and observing, DO Baxter repeatedly yells at Ms. Turley to stand up: "Turley, get up... You're gonna have to get up off the floor... You can get up. **You're fine. There's nothing wrong with you...**" When Ms. Turley pleads, "I'm trying," Baxter responds, "No, you're not. You're just laying there... If I have to make you get up we're going to have problems. Get the hell up off the floor."

58.    When Ms. Turley pleads, ***"please, help me!"*** LPN Noel – who has been standing in the hall just outside the door – joins in, saying ***"You can get up yourself. There's nothing wrong with you..." When Turley continues to beg for help, Turn Key LPN Noel responds, "Nope.*** You're gonna have to do it yourself."

59.    There was absolutely no basis for DO Baxter's and LPN Noel's assumption that Ms. Turley was faking her illness. Just a day and a half earlier, a physician had warned that Ms. Turley had a potentially serious medical condition and needed to be returned to the emergency room immediately if her symptoms worsened. Instead, Noel and Baxter assume Turley's worsening symptoms mean she is malingering.

*60.*    When Ms. Turley is unable to stand, DO Baxter enters Cell #3 and lifts Turley up. Ms. Turley screams in pain. Video shows DO Baxter carrying Turley down the hall, holding her under her arms. It is clear that Turley cannot walk on her own. *LPN Noel observes all of this but takes <u>no</u> <u>action</u> to assist or care for her.*

61.    When DO Baxter opens the door to Cell #8, Ms. Turley is still screaming in pain. Once inside the cell, DO Baxter lets go of her. ***Ms. Turley stumbles and then falls backwards onto the floor. She cries out in pain.*** The inmates call out for help, and DO Baxter and LPN Noel return to the cell. The inmates report to Baxter and Noel that Turley has fallen. ***Baxter and Noel simply watch as an inmate lifts Turley off the floor and tries to get her to stand on her own. She cannot.***

62.    Baxter and Noel watch as the inmate carries Ms. Turley under her arms to the door of the cell. Once she is within reach, DO Baxter reaches through the bars of the door, grabs Ms. Turley by her shirt and pulls her against the door, stating, "Stand up here and look at the nurse if you want her to look at your shit." At that point, ***the inmates inform Baxter and Noel that Ms. Turley has defecated in her pants.***

63.    ***Ms. Turley cannot stand. Her face shows that she is obviously in extreme medical distress. Yet Baxter and Noel simply walk away, leaving the inmate holding Ms. Turley up under her arms.***

64.    According to an "Incident Report" that DO Ingram wrote after Ms. Turley's death:

> While Sargent Baxter and I moved female inmate Turley she defecated herself on the way to cell #8 then she fell backwards as soon as she got in the tier, so I went and grabbed her a new change of pink and a towel. The females in cell #8 helped her shower and cleaned her up. Turley ended up defecating herself again so the females cleaned her up one more time and female inmate Winn gave her one of her Depends to wear just in case.

65.    In other words, around 7:50 AM on August 6 – approximately 16 hours before a police officer would find Ms. Turley unresponsive on a cell floor, cold to the touch,

with blood and white foam coming from her mouth – DO Baxter, DO Ingram, and LPN Noel know that Turley cannot stand or walk on her own. They know she has lost control of her bowels and is repeatedly defecating on herself. Despite explicit instructions to return Ms. Turley to the emergency room if her conditions worsened, Baxter, Ingram, and Noel offer her no care. Instead, they allow the other inmates to clean Ms. Turley in the shower and provide a diaper so that Turley can continue to defecate on herself.

66.    DO Baxter's incident report likewise frankly acknowledges the deliberate indifference of both Jail and Turn Key staff to Ms. Turley's emergent medical needs. She recounts:

> I asked Turley several times to stand up and come to the cell door, she would just at me and say, "ok, I'm trying." ***When she couldn't get up on her own I went into cell 3 to assist her to her feet. Once she was on her feet she was pretty unsteady and most of her weight was on me*** at this time. I assisted Turley back to cell 8, I opened the catch pen and got her through the threshold of the cell, I moved my hands from under her arms where she stood by herself but she was leaned against the wall just inside the cell door. I walked out of the catch pen and shut the cell door, as I got my keys out to secure the door ***I heard another inmate from that cell start yelling and screaming my name and said Turley fell and hit her head.*** I opened the cell door and Nurse Lynnsee [LPN Noel] was standing in close proximity of cell 8 and ***I asked Lynnsee if she wanted me to pull her back out so she could look at her.*** Lynnsee stated, "hang on, I'm gonna go back on camera and see." Once she observes the camera ***she looks at me and says, "she didn't hit her head she's fine."***

67.    Being unable to walk unassisted – and collapsing to the floor when support is removed – are obvious signs of an emergency medical condition. Yet when LPN Noel is informed of Ms. Turley's collapse, she does *absolutely <u>nothing</u>* to assist her or even check on her. Instead, she watches a video of Ms. Turley collapsing, determines she did not hit her head, and therefore concludes "she's fine."

68.     DOs Ingram and Baxter speak with inmates in Cell 8. When an inmate states, "I'm not gonna be taking care of her all day," Baxter responds, "If you want me to get her out of here don't make comments like that again."

69.     After cleaning her and changing her clothes, Ms. Turley's fellow cellmates help her return to a cot. These inmates have provided the only care and compassion Ms. Turley has received as her condition has deteriorated following her return from the hospital. But these inmates have also heard the Jail staff indicate that there is nothing wrong with Ms. Turley – that she is faking her symptoms. As a result, the inmates resent cleaning her feces off of her and grow annoyed at her moans and screams. They grow angry, making comments like:

> "Shut up, you fucking idiot. You look like a fucking idiot."

> "She is disrespectful and narcissistic, selfish, self-absorbed, pathetic, disgusting, stinks, has no fucking dignity."

70.     The anger and irritation of Ms. Turley's cellmates continues to grow. According to DO Baxter's Incident Report, "The females in cell 8 during every security check came up and stated that they were not gonna deal with her all day or take care of her all day. ***Some were stating they wanted 'to beat her ass.'" The dangers to Ms. Turley in her already dire and vulnerable state were obvious. Yet no member of the Jail staff removed Ms. Turley from Cell #8 to protect her.*** Instead, they show total indifference. When one inmate states, ***"What's gonna happen when she gets her ass whooped?" DO Ingram responds, "I can't do anything about it...*** I know y'all are upset..." With Ingram and another DO standing at the door

to the cell, an inmate screams at Turley, "This is fake and I can't handle it. I'm finna make her hit her head and shut the fuck up." The DOs take no action to protect Ms. Turley or to defuse the inmates' escalating anger.

71.    In her Incident Report, DO Baxter claims that she then called Jail Administrator Tim Joslin and "asked if there was something that we could do with [T]urley." According to Baxter's report, Lt. Joslin "advised to send her to the hospital and *medical stated, 'why, there is no reason to send her all her vitals and everything came back good from the hospital.' Lt Joslin then called medical and asked if Turley needed to go to the hospital and she states, 'no.'"*

72.    DO Ingram's report makes the same claim, stating "Baxter told the nurse what Lieutenant Joslin said about sending her back to the hospital but *the nurse said no she is not signing off on it* because she keeps coming back with everything fine and told us she was good to go."

73.    Although DOs Baxter and Ingram's reports – written after Ms. Turley's death – clearly seek to absolve themselves of responsibility for her neglect at the Jail, in fact their reports merely emphasize the deliberate indifference of both the Jail's staff and its policies and practices. Their reports show that they all understood that Turley had an emergent medical condition and needed to go to the hospital. However, according to the Jail Administrator himself, the Jail is operating under a policy that gives Turn Key's LPN – a minimally trained nurse who is not licensed nor otherwise qualified to diagnose illnesses – authority to veto sending inmates to the hospital, even when they suffer from obvious medical emergencies. The Jail Administrator and multiple detention officers know Ms.

Turley is supposed to return to the emergency room if her condition worsens, and they know her condition has deteriorated alarmingly. Yet they disregard the obvious, serious risks facing Ms. Turley. They ignore the physician's explicit instructions and instead defer to an unqualified LPN.

74.    Turn Key LPN Noel also displays abject indifference to Ms. Turley's pain and the serious risk of severe illness and death. Indeed, LPN Noel's conduct toward Ms. Turley is utterly inhumane and indefensible. Noel has received explicit instructions from a physician to give Ms. Turley an antibiotic to prevent the spread of infection, and to return Turley to the emergency room immediately if her symptoms worsen. Instead, she refuses to give Ms. Turley her antibiotic, takes no action to care for her when she cannot stand or walk on her own, and refuses to send her to the hospital – even when urged to do so by Jail staff. Instead, she falsely states that "everything came back good from the hospital."

75.    At 9:27 AM, DO Baxter enters Cell #8 to retrieve Ms. Turley. Ms. Turley cannot stand or walk without assistance. One inmate tells Baxter that another inmate has been helping Ms. Turley. The other inmates responds, "Yeah, I'm tired of it. I got poop and blood all over me. I'm done with this." Another says, "As soon as she got out of the shower, Jennifer, she shit on me." When DO Baxter asks why Ms. Turley's clothes are wet, an inmate admits to throwing water at her.

76.    Instead of showing any concern for Ms. Turley – who she knows cannot stand or walk, has lost control of her bowels, and is being abused by other inmates – Baxter merely tells DO Ingram, "Get me a different shirt. I'm not carrying her wet."

77.     Ingram retrieves another shirt. Ms. Turley cannot even change her own shirt, so an inmate changes her shirt for her. Ms. Turley cries in pain as the inmate moves her. Again, instead of showing any concern, **DO Baxter says to her, "If I have to drag you out of here, I promise you it's not gonna be pretty."** Because Ms. Turley cannot stand or walk on her own, eventually Baxter roughly lifts her off the floor and carries her under her arms out the door. Ms. Turley screams in pain. Later, Baxter states in her report that Turley "could/would not get up on her own so a few of the females helped her up and assisted her to the catch pen door where I took over and assisted Turley by standing behind her with my hands under her arms, where again she puts all of her weight on me."

78.     Baxter half-carries Ms. Turley to see Turn Key LPN Noel. But rather than showing any concern for Ms. Turley – or following the explicit instructions of the hospital physician – LPN Noel shows total indifference for Ms. Turley's health and wellbeing. She completes a "Post-Hospitalization/Off-Site Consultation Assessment" form to document this visit. The form has boxes to check if the patient is "tender" or has suffered "incontinence." Although Ms. Turley has been in extreme pain and has repeatedly defecated on herself, LPN Noel did not check either of these boxes. Noel also left blank the section in which the nurse is supposed to describe the treatment the inmate received at the hospital. The form makes no mention of the antibiotic Ms. Turley was prescribed there, or of the explicit instructions to return her to the emergency room immediately if her symptoms worsened.

79.     Similarly, the section describing the "plan" for Ms. Turley's care is left completely empty. "Monitor s/s [signs and symptoms] of infection" is not checked, even

23

though Ms. Turley has been given an antibiotic prescription to treat a possible infection. "Monitor presence of pain" is not checked, even though the reasons for her medical visit were her complaints and obvious signs of severe pain. The section where the medical professional is supposed to indicate the next clinic date is also blank.

80.    Noel does check the box noting that Turley needed "Maximal assist" to get to the medical unit is checked, so it is clear that she knows Turley is unable to walk on her own. Moreover, Noel's progress notes indicate that during this visit Ms. Turley was "moaning and saying ow," and that she had been "informed patient had been incontinent of bowel." Yet Noel takes *no action* to provide any care to her. Not only does she not call an ambulance to transport Ms. Turley to the hospital – she does not even give Ms. Turley her prescribed antibiotic. Instead, she has jailers return Ms. Turley to Cell #8. As DO Baxter's report describes:

> once Lynnsee [LPN Noel] told me that she was done with Turley I told her to get up so she could walk back to the cell. With Assistance she was able to stand up but not on her own. I then placed her back into cell 8 where she was taken back to her mat which was laying on the floor between the dayroom table and the phones.

81.    By contrast, DO Ingram falsified her report, claiming that "Inmate Turley walked herself back to female cell #8..."

82.    DO Ingram's report further states that, after returning her to Cell #8, "Turley continued to say that she needed help but would not say what was wrong." Yet neither Ingram nor any other member of the Jail or Turn Key staff seeks to provide any care for her.

24

83.     DO Baxter's report likewise acknowledges that ***"Turley appeared to be in some sort of pain because of the way she was acting but when I advise medical, all her stuff is normal."*** But Ms. Turley's condition is clearly not "normal" – and this would be obvious to any layperson. Moreover, DO Baxter and the rest of the Jail staff know that Turley has not been assessed by any qualified medical personnel since returning from the hospital. Instead, she has only been seen by an LPN, who by law cannot diagnose patients. Moreover, Baxter and the rest of the Jail staff know that the hospital physician emphasized that "[p]ain can mean a serious problem," and that she needs to be returned to the emergency room immediately if she experiences "pain that becomes more severe [or] steady," or if she even simply "fail[s] to improve as expected." The instructions from the hospital emphasized – in bold letters – "**[Y]ou should return if there is unexpected worsening or a significant change in your symptoms... RETURN WITH ANY WORSENING CONCERNS**" (emphasis in original). Yet when presented with Ms. Turley's worsening pain, inability to stand or walk, and inability to control her bowels, both Jail staff and the Turn Key LPN deliberately disregard the serious risk to her health.

84.     When DO Baxter deposits Ms. Turley back in Cell #8, she orders Turley to get onto the mat on the floor. ***As soon as she lets go of Turley, however, Turley immediately falls backwards toward her. Instead of seeking assistance for her or showing any concern for her obviously emergent condition, DO Baxter responds, "No, we're not playing that game."***

85.    Ms. Turley collapses onto a mat on the floor that is lying between the picnic table in the center of the room and the phone on the wall of the cell. Despite their awareness of Turley's dire symptoms and urgent need for medical care, Jail staff and Nurse Noel tell the inmates there is nothing medically wrong with her. One inmate says, "She's just a faker... Jennifer [Baxter] said she walked fine... She's faking this shit. She walked just normal out there."

86.    Surveillance video, LPN Noel's notes, and Baxter's own written report all flatly contradict Baxter's claim to the inmates that Ms. Turley "walked fine" when taken from the room. But the jailer's false claims poison the inmates against Ms. Turley. Because they have been told there is nothing wrong with her, they grow increasingly angry about what they believe is her malingering – particularly her inability to stop moaning in pain. They begin screaming at her:

> "You are wearing my fucking patience all the fucking way out... I still wiped your fucking ass and gave you a goddamn shower and got the shit out from between your butt cheeks. And then you had the nerve to shit on me when you got out and now you shit on yourself again."

> "You think we want to sit here and hear you're whining all fucking day – again! We're tired of it! We're mentally fucking exhausted. I want to get up and slap the fuck out of you!"

> "You're fucking faking it and you need to shut the fuck up!"

> "Ain't nobody gonna help you take a shower again. You can sit there in your own shit."

> "You've got a sickness and it's called a hypochondria. It's a mental illness."

> "Kayla, shut your fucking mouth! Do you understand me? I will slap the fuck out of you and I am not bullshitting you."

"I am so fucking sick of hearing your fucking mouth. Shut up! ***I will knock your fucking head against that goddamn wall…***"

***"I will kick you in the fucking head bitch and knock you the fuck out… I guarantee you I will break some bones…"***

"Get a fucking grip. ***You're about to be bruised up and bleeding from your fucking head…***"

87.    **DO Baxter and LPN Noel are watching and listening to the abuse.**

An inmate uses the intercom to call Baxter, who answers:

Inmate: "Jennifer?"

DO Baxter: "Yeah."

Inmate: "I am struggling..."

DO Baxter: "I know. ***We're sitting here watching you!***"

***The inmates erupt into laughter.*** The exchange continues:

Inmate: "***Can't there be a glitch in the system for a second?*** Just 30 seconds! There's a glitch in the system, isn't there?"

DO Baxter: ***"Yeah."***

Inmate: "Ok! Two-minute window!"

88.    Given the green light by Jail staff, the inmates escalate from screams to physical assaults. One throws a shoe at Ms. Turley. Another throws a cup. One inmate bangs a shoe on the bench above Ms. Turley's head and then slaps it near her head, threatening to hit her. One inmate smothers her with a blanket. An inmate stands over Turley and prays over her, saying "Get the demons out of her, because if you don't, I'm about to. Please help her because I'm gonna lose my patience, and you know how much I can be pushed." The inmate begins to pour water into her mouth, screaming "drink that

27

fucking water!" Ms. Turley tries to resist but she is helpless. The inmate dumps the water over Turley's head.

89.    When DO Ingram returns to Cell #8 to provide lunch, Ms. Turley is lying on a mat on the floor. An inmate tells Ingram that she will take Ms. Turley's tray and help her eat. Ingram responds, "Make her get up and get it." ***DO Ingram sees clearly that Ms. Turley cannot stand up. Ingram then prohibits the other inmates from helping Ms. Turley eat***, stating, "Kayla, you're gonna have to get up and get your own tray. I cannot have any of these other females touch it." Ms. Turley cannot respond.

90.    Instead of checking on Turley or calling an ambulance, DO Ingram simply notes in the logbook "Inmate Turley would not get up for her meds or her trays." Since Turley "would not get up," ***DO Ingram denies her yet another dose of the antibiotic she was prescribed at the hospital. Her*** **infection continues to worsen.**

91.    Inmates shove Ms. Turley and her mat under the table as other inmates laugh. As Turley moans, an inmate approaches her, bends down over her, and tells her "shut your fucking mouth." When Turley moans again, ***the inmate slaps her face*** and repeats her command. ***Ms. Turley cries in pain. The inmate covers Turley's mouth with her hand*** and continues to order her to be quiet. Ms. Turley's muffled cries can be heard on the surveillance video.

92.    When DO Ingram returns to Cell #8 to collect dishes at 11:08 AM, she sees that Ms. Turley is shoved under the table directly in front of the door. She is moaning in

pain. *Ingram does <u>nothing</u>* to assist Ms. Turley. She walks away and closes the door behind her.

93.    At 11:10 AM, an inmate storms over to Ms. Turley with a sock in her hand, telling her "shut your fucking mouth." Ms. Turley's screams are then muffled. The inmate briefly walks away while Turley continues moaning in pain. A few minutes later, the inmate returns, continues telling Ms. Turley to "shut up," and says, "I don't wanna hear one more word or I will kill you." She reaches towards Turley, whose screams are muffled again. The inmate tells Turley to "shut the fuck up," and shoves her.

94.    Again, DO Baxter, DO Ingram, DO Vincent Matthews, and Turn Key LPN Noel are all aware that Ms. Turley's cellmates are torturing her. According to Ingram's Incident Report:

> Sargent Baxter, Matthews, the nurse, and I were watching the cameras and checking up on female cell #8 like normal... The females in cell #8 were getting irritated at her and started throwing shoes and water at her, screaming and telling her to "shut up!" One of the females got in her face, covering her up with her blanket and eventually drug her on her mat under the picnic table in the cell.

95.    Jail staff and the Turn Key LPN all know that Ms. Turley has recently returned from the hospital, that she is too sick to stand or walk on her own, that she has lost control of her bowels, and that she is suffering from terrible pain. Yet they stand by and watch as multiple inmates abuse Ms. Turley, without intervening to protect her from this torture. Instead, DO Baxter merely "got female inmate Turley another new set of pinks because the girls had soaked her in water."

96.     Over the ensuing hours – as Ms. Turley is slowly dying in front of their eyes – Jail and Turn Key staff continue to allow her cellmates to torture her. At 11:29 AM, DO Ingram approaches the door of Cell #8. She sees that Ms. Turley has been shoved under the bench of the picnic table and that an inmate is sitting directly above her head, bending over Ms. Turley and assaulting her. DO Ingram does not intervene to help her. She watches until the inmate stands up and comes to the door to talk with her:

> Inmate: "I'm a very compassionate person."
>
> DO Ingram: "I know."
>
> Inmate: "And I cannot stand people who do this."
>
> DO Ingram: "I know."

They share a laugh.

97.     DO Ingram takes *no action* to protect Ms. Turley. Instead, she simply leaves the cell. Immediately after her departure, an inmate charges toward Ms. Turley, screaming, "Shut the fuck up! How you like it?" Another inmate repeated pours water onto Turley. Ingram writes "female cell #8 all secure" in the Jail's logbook.

98.     After watching Ms. Turley be stuffed under a table and abused for more than *six (6) hours*, at 4:07 PM DO Baxter and LPN Noel approach Cell #8. Baxter states to an inmate, "I need Turley... ***She better get the hell up. Because if I have to carry her again…"***

99.     Ms. Turley cannot stand up. Even when an inmate assists her to her feet, she cannot remain standing and collapses to the floor.

100.    ***The inmate tells Baxter, "She can't get up." Baxter responds, "She***

***can.*** She walked just fine for medical." In fact, however, LPN Noel had documented that

Turley had needed "maximal assist[ance] when walking to and from medical (7 hours

earlier), and Baxter herself had provided that assistance. Baxter noted in her written report

that she had had to "assist[ ] Turley by standing behind her with my hands under her arms,

where again she puts all of her weight on me."

101.    Ms. Turley struggles to stand, but clearly cannot. DO Baxter barks at her,

"Get up!" When one inmate is unable to get Ms. Turley to her feet, a much larger inmate

pushes her out of the way and yanks Turley up off the floor. ***DO Baxter instructs the***

***inmate, "Make her walk. I'm not carrying her."*** The inmates begin to shout at Ms.

Turley, "Walk!" Baxter again says, "She can walk just fine."

102.    But Ms. Turley cannot move. So – in front of DO Baxter – they shove her

toward the door and into Baxter. As soon as they let go, ***she collapses to the floor.***

***Baxter responds, "Get the hell up! Get up!"*** Baxter lifts her off the floor and carries

her out of Cell #8. LPN Noel witnesses all of this from the hall.

103.    Although DO Baxter has told the other inmates that Ms. Turley is fully

capable of standing and walking, her written report shows that she knew Ms. Turley was

too sick to stand on her own:

> ***I went into cell 8 again and Turley can not stand up on her***
> ***own,*** Inmate Ashley Welsh tries helping her to her feet but has no
> luck, then inmate Kathleen Tolison comes overs and shoves Welsh's
> hands out of the way and picks Turley up and assists her to the catch
> pen.

104. DO Baxter and LPN Noel see that Ms. Turley is shaking and unable to stand on her own. Although this is an obvious sign that Turley needs emergency care – and they have been instructed to return her to the emergency room immediately if her condition worsens – *they do not call an ambulance.* In fact, they make *no attempt* to assess her or provide her any care. Instead, they allow Turley's cellmates to pick her up and then DO Baxter "assists" Turley – who cannot walk on her own – to move to isolation Cell #3. Again, Baxter documents this deliberate indifference in her written report:

> I assist her to cell 3, once inside I let go of Turley to see if she could stand on her own, when I let her go she was standing by herself but she was pretty wobbly. **She lost her balance and almost fell into the toilet and sink** but I caught her before she did. I walked her over to her mat at this point and **tried to sit her down on her mat but her knees were staying in the locked position, finally after a few seconds her knees buckled which caused her and myself to lose our balance.** I sat her on the mat then I shut and secured the cell door while I went and got her a blanket to cover up with.

105. Again, DO Baxter and LPN Noel have encountered an inmate who cannot stand or walk on her own, who collapses when she is no longer being supported, and whose legs are stiff and in a locked position until they finally buckle. Again, they do not call an ambulance. They provide her *no care.* They lock her into a cell and walk away. This is deliberate indifference to a serious medical need. This is reckless neglect. This is inhumane mistreatment.

106. DO Baxter has shoved Ms. Turley into a corner on the floor. Ms. Turley is breathing heavily and shaking. She convulses and cries with pain.

107. DO Baxter and LPN Noel return to Cell #3 at 4:22 PM. Despite being fully aware that Ms. Turley cannot stand on her own, Baxter says to her, **"Do you want your**

*meds? You got to get up and come get them."* Turley, writhing in pain on the floor, merely responds "Ow, oh god." ***Instead of giving Ms. Turley her prescribed antibiotic, DO Baxter slams shut the tray slot on the door and walks away. Turley's** **infection continues to worsen.*** In eight hours, she will be found unresponsive, bleeding and foaming from her mouth.

108.    DO Baxter's written report acknowledges her deliberate indifference:

> We continued our hourly site checks on Turley, we would call out her name and ***she would acknowledge that we were standing there by turning her head in the direction of our voices. During med pass I stood at the food port and called Turley's name multiple times and told her she needed to get up and get her medicine, she acknowledged that fact too but couldn't/wouldn't move on her own.***

109.    DO Baxter knows Ms. Turley needs her antibiotic. She knows Turley is unable to stand. She knows Turley is now not even able to respond verbally – she can only supposedly "acknowledge that we were standing there by turning her head in the direction of our voices." Yet not only does Baxter not immediately call an ambulance, she refuses to give Turley her medication or to take any other steps to help her.

110.    Turn Key LPN Noel also knows all of these facts. She, too, declines to offer even minimal assistance to Ms. Turley. Instead, ***she writes in her progress notes, "Refused to get up and get meds."***

111.    As a result of this deliberate indifference, Ms. Turley misses another dose of her prescribed antibiotic, and her infection continues to spread unchecked. Ms. Turley is now just hours away from suffering multisystem organ failure.

112.    At 4:44 PM, DO Baxter returns to Cell #3 and opens the tray slot on the door. Again, she is fully aware that Ms. Turley is unable to stand or walk on her own. Yet she says to Turley, "Do you want your tray? You got to get up and come get it. I can't bring this in." Turley merely cries in response. DO Baxter slams the tray slot shut and walks away.

113.    More hours pass and Ms. Turley gets closer to her death. At 6:36 PM, DO Kelley peeks through the window of Cell #3. She sees Turley lying face down on the floor and hears her moaning. ***DO Kelley says, "Hellooooo. How are you?" When Ms. Turley does not respond, Kelley says "ok," closes the window, and walks away.*** This is deliberate indifference.

114.    DO Melton begins her shift at 7:00 PM on August 6. In a written report, Melton states that "Sgt Baxter advised me that [Turley] walked normally to her visit" with LPN Noel. Of course, this utterly false. Either DO Melton falsified her report, or DO Baxter lied to her. Baxter's own report notes that during that visit, Turley "could/would not get up on her own so a few of the females helped her up and assisted her to the catch pen door where I took over and assisted Turley by standing behind her with my hands under her arms, where again she puts all of her weight on me."

115.    DO Melton's report further states that DO Paula Kelley "advised me [Turley] was still laying on the floor and was ***responding by looking at her and moaning.*** Ms. Turley would stop moaning and moving her head until the next sight check... During every site check, Ms. Turley was breathing and responding in some kind of way." DO Melton knows that Ms. Turley can only "respond" by "looking at her and

34

moaning." Yet Melton's own report shows that since Ms. Turley is still breathing, she takes no action in response to Ms. Turley's serious medical needs. In less than 5 hours, Ms. Turley will be found unresponsive on the floor of Cell #3, bleeding and foaming from her mouth.

116.    Consistent with the clear policy and practice at the Garvin County Jail, DO Kelley's report displays the same deliberate indifference shown by every single staff member who interacted with Ms. Turley on August 5 and 6. According to DO Kelley, she checked on Ms. Turley after starting her shift at 6:45 PM. Kelley writes, ***"When I asked [Turley] if she was ok, she moved and blinked her eyes, and mumbled."***

117.    In other words, Ms. Turley is verbally unresponsive. She is only able to blink her eyes and mumble. Yet DO Kelley does not call an ambulance. She does not call anyone. She takes no action to help Ms. Turley. ***She simply leaves her on the floor of the cell – dying – for another 5 hours.***

118.    DO Kelley's report continues, "On my next site check which is approx. every hour, ***I asked Ms. Turley again does she need anything*** and if she was ok. Again, her eyes were open like the first initial count, ***she blinked and mumbled*** and moved her body." From DO Kelley's report, it is clear that – just like DO Melton – she did not believe Ms. Turley deserved care as long as she could blink and mumble. Before Ms. Turley could receive the emergent care she desperately needed, she would have to be completely unresponsive. By that time, it will be too late to save her life.

119.    At 7:56 PM, DO Kelley looks in through the window of Cell #3. She sees that Turley has slid off her mat and is lying on the concrete floor. She bangs on the window,

saying, "Hey. Hello?" Ms. Turley moans in pain. Kelley asks, "You ok?" Turley moans and cries. Instead of calling an ambulance or even simply entering the cell to check on Ms. Turley, DO Kelley just stares at her. She shuts the window and walks away.

120.    At 9:19 PM, DO Melton opens the window to Cell #3. She sees that Ms. Turley has slid off her mat and is lying on the bare concrete floor. She sees that her condition has not improved. She takes *no action* to help Ms. Turley.

121.    At 10:32 PM, DO Kelley stops at Cell #3. She looks through the window in the door and says to Turley, "Do you need help? Do you need a cup?" Ms. Turley does not respond. Although Turley's labored breathing is audible from the video from her cell, DO Kelley merely says, "I can't hear you." When Turley does not respond, Kelley does not open the cell door to check on her. She does not call an ambulance. She simply walks away, again.

122.    DO Kelley's entry in the Jail's logbook confirms this deliberate indifference. She writes:

> Sgt Melton and I have both tried to talk to inmate Kayla Turley in Cell 3 and ***she doesn't respond except for raising her head a little bit off the floor and shaking***... We have asked her if she wants us to put her back on her mat but ***no response***. Her eyes are opened and she hears us speaking to her but she does not speak. She has a large bruise on her elbow as well.

123.    Just two days earlier, Ms. Turley had returned from the hospital mentally coherent and walking under her own power. At that time, a physician explicitly instructed that she must be returned to the emergency room immediately if her symptoms worsened. Two days later, ***Ms. Turley is not only unable to stand or walk − she is unable to***

*even speak. Yet the Jail's staff takes no action to seek care for her. They simply walk away.* This is deliberate indifference.

124.     Another hour passes. At 11:23 PM, DOs Melton and Kelley return to Cell #3. They finally open the door and walk into the cell. They speak to Ms. Turley:

> "Hey, is it still your stomach that's bothering you?"
>
> "Do you know what happened to your arm?"
>
> *"Why aren't you speaking? Does it hurt too much?"*
>
> *"Are you unable to move?"*
>
> *"She's been laying on the floor for hours."*
>
> *"She's sweating."*
>
> *"You need to go back to the hospital?"*

125.     Ms. Turley is unresponsive. She only moans. She is dying in front of them. Yet **DOs Melton and Kelley do <u>nothing</u>. They walk away, locking Ms. Turley into the cell behind them.**

126.     Once again, DOs Melton and Kelley both document the Jail staff's deliberate indifference in writing. DO Melton describes this encounter in her Incident Report, stating:

> [DO] Kelley and I decided to go into cell 3 to check on Ms. Turley a little closer. Kelley trying to get Ms. Turley to respond, ask [sic] Ms. Turley, "You ready to go home?" I even put my hand on her forehead to see if she would respond to my touch. *When I touched her forehead she was warm and sweaty and looked up at me moving her head and responding with eye movement.* We also asked her if she would like us to move her to her mat. Kelley continued to do her site checks as required.

127.    DO Kelley's entry in the Jail's logbook states, "Sgt Melton and I tried to talk to her again but she acts like she can't speak." In her Incident Report, she writes:

> At approx 23:23 Sgt. Melton and I went into the cell to see if she wanted to be on her mat. As soon as I walked into the cell ***I said, "Are you ready to go home?" trying to get a response. She moved and moaned some.*** We both decided not to move her because she seemed comfortable. ***We left*** out of the cell at this time.

128.    By their own admissions, DOs Melton and Kelley have found Ms. Turley in her cell moaning in pain, sweating, and unable to speak. She is supposedly "responding" only "with eye movement." Even without a physician's previous, explicit instructions, any layperson would know Ms. Turley is suffering an emergency medical condition that requires immediate transfer to a hospital. In less than an hour, she will be found unresponsive, cold to the touch, foaming and bleeding from her mouth. But just like every other Jail and Turn Key staff member who interacted with Ms. Turley after her return from the hospital, they do *nothing* to help her. They simply "continued to do [ ] site checks as required." And another hour passes.

129.    At 12:23 AM on August 7, Lindsay Police Officer Cory Rouse comes to the Garvin County Jail to book an arrestee. At that point, DO Kelley asks this police officer to check on Ms. Turley – even though he has even less medical training (if any) than the Turn Key LPN who is supposedly caring for inmates at the Jail. Unlike the multiple members of the Jail staff and the Turn Key LPN, Officer Rouse takes immediate action to help Ms. Turley. Through the tray slot, Rouse and Kelley can hear that Ms. Turley is gasping for air, face down on the concrete floor. According to DO Kelley's written report, "Rouse bent

down and looked through the food port. He said, 'Yes we need to go inside the cell and check on her.'"

130.    When Officer Rouse and DO Melton enter the cell, they find Ms. Turley unresponsive, with "blood and white foam coming out of her mouth." ***Officer Rouse asks, "You got a nurse on duty?" Melton responds that they do not.*** They roll Turley over. ***Her blood is smeared on the concrete floor where she has spent the past several hours face down, struggling to breathe.***

131.    ***Yet DO Melton <u>still</u> does not immediately call an ambulance.*** The Jail and Turn Key have a policy, practice, or custom that prohibits Jail staff from calling an ambulance without Turn Key's approval – even when no medical personnel are present at the Jail and an inmate is dying in front of them. DO Kelley's written report confirms that she "called the provider and then the provider told me to call the ambulance."

132.    DO Kelley then calls Jail Administrator Joslin and seeks to justify the need for an ambulance, stating, "Hey Tim, I need to call EMS... She is foaming at the mouth... She has blood coming out of her mouth. She is not responding at all... Turley, Kayla... Her lips are blue..."

133.    After watching Ms. Turley suffer and deteriorate for more than two days, Jail staff finally calls EMS. It is not clear when, if ever, Jail staff would have taken any action to assist Ms. Turley if Officer Rouse had not arrived on the scene and insisted on entering her cell.

134.    Garvin County Deputy Dakota Garrison enters Cell 3 before EMS arrives. His written report describes Ms. Turley's condition:

> I observed Kayla to have **blood and a white foam coming from her mouth** area and was having **labored breathing, only making a groaning sound**. I also observed Kayla's pupils to be dilated, Kayla was **unresponsive to verbal commands**. I attempted to get a Spo2 and pulse rate reading on Kayla using a pulse oximeter on her hand, I noticed her hands to be **cold to the touch** and upon picking up her arm to place it in a better position, it was **limp**.

135.    EMS's patient care record confirms and expands on Deputy Garrison's description, finding Ms. Turley "unresponsive," her skin "clammy, cold, mottled," "Pt is grinding teeth and bleeding from mouth," "dysconjugate gaze," *"non-reactive,"* *"shallow respirations with pending respiratory failure," "motor function absent," "pulse absent." "Vomit and bloody mucous found in mouth and on her clothing*... Skin cold, pale and clammy with mottling extremities. Capillary refill greater than 4 seconds with poor skin turgor." Her blood pressure is measured at 80/40, signifying that she is in shock.

136.    Ms. Turley is lifted onto a gurney and evacuated from the Jail. She is in such critical condition that EMS concludes she must be airlifted to Norman Regional Healthplex in a desperate attempt to save her life.

137.    Incredibly, the deliberate indifference of the Jail and Turn Key staff continues even after Ms. Turley is removed from the cell on a gurney. In emergency medicine, timely and accurate information can be critical to saving a patient's life. Yet when explaining Ms. Turley's condition and medical history to EMS – a description they know medical providers will rely on in trying to save Turley's life – Jail and Turn Key staff attempt to cover up their criminal neglect of Turley by omitting critical facts and falsifying

others. They do not disclose that Ms. Turley had been sick for days, or that she had been examined by a physician who insisted that she be returned to the emergency room if her symptoms worsened. They do not disclose that her condition had been deteriorating precipitously and that she had been in constant pain for the past 48 hours. They do not disclose that they have refused to give her the antibiotic that was prescribed for her by a physician at the hospital.

138.    Instead of sharing information that could help medical providers save Ms. Turley's life, ***Jail staff falsely report to EMS*** that "[s]he has been in solitary confinement for the last several days" and that she was known to be well just "hours prior to arrival." Jail staff "reported no trauma but possibly ingestion" and stated that she was ***"last seen normal 2 hours prior to being seen."*** And ***they falsely tell EMS that Ms. Turley's symptoms could be the result of overdosing on fentanyl: "Jail staff reports that ingestion could be possible."*** Jail staff knew beyond doubt that these claims were false.

139.    Ultimately, as a result of Jail and Turn Key staff's deliberate indifference to Ms. Turley's serious medical needs, on August 9, 2023 – just two days after being evacuated from the Jail – Ms. Turley died from multisystem organ failure.

140.    Ms. Turley was just 32 years old when she died.

141.    Following her untimely death, the FBI investigated Ms. Turley's treatment by GCSO and Turn Key staff while at the Jail. On December 3, 2024, a federal grand jury returned a two-count indictment that charged Defendants Noel, Baxter, Ingram, Kelley, and Matthews with criminal violations of Ms. Turley's civil rights.

142.    Count I of the indictment avers that:

BAXTER, INGRAM, MATTHEWS, and NOEL knew that K.T., a pretrial detainee in their care and custody, faced a risk of serious physical harm at the hands of other inmates in K.T.'s GCJ cell, and willfully failed to take reasonable measures to abate that risk, thereby acting with deliberate indifference to a substantial risk of serious harm to K. T. This offense resulted in bodily injury to K.T.

143.    Count II avers of the indictment avers that:

BAXTER, INGRAM, KELLEY, MATTHEWS, MELTON, and NOEL knew that K.T. [Kayla Turley], a pretrial detainee in their care and custody, had serious medical needs, and willfully failed to ensure that K. T. was provided with necessary medical care, thereby acting with deliberate indifference to a substantial risk of serious harm to K.T. This offense resulted in bodily injury to K.T. and resulted in K.T.'s death.

144.    If convicted, Defendants Noel, Baxter, Ingram, Kelley, and Matthews face maximum sentences of life in prison.

### Turn Key and the Sheriff/GCSO/ County's Policies and/or Customs

145.    All preceding paragraphs are incorporated herein by reference.

146.    It is believed that Defendant Turn Key is the largest private medical care provider to county jails in the state. Turn Key has used its political connections to obtain contracts in a number of counties, including Garvin County, Cleveland County, Oklahoma County, Creek County, Tulsa County, Muskogee County, Garfield County, Ottawa County, Pottawatomie County, and Creek County.

147.    Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Ms. Turley's death, Garvin County knew, or should have known, that Turn Key's grossly deficient system and

"plan" posed excessive risks to the health and safety of inmates, like Ms. Turley, who suffer from serious medical conditions.

148.    To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical care service in a manner that would maintain or increase its profit margin.

149.    Under the Contract, Turn Key is responsible for paying the costs of all pharmaceuticals at the Jail up to a certain amount. If the annual pharmaceutical costs exceed this limit, GCSO/Garvin County is responsible for the excess costs.

150.    Similarly, Turn Key was responsible for paying the costs of all off-site medical services and hospitalizations up to a certain amount, and GCSO/Garvin County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

151.    The Contract provided that Turn Key would arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, required hospitalization – up to the agreed-upon limit.

152.    These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, like Ms. Turley, at the Jail and to avoid off-site medical costs.

153.    These financial incentives create risks to the health and safety of inmates like Ms. Turley who have serious medical conditions such as substance abuse disorder and are undergoing the process of withdrawal.

154.    Turn Key provides inadequate guidance, training, and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs.

155.    Specifically, Turn Key has an established practice of failing to adequately assess and treat – and ignoring and disregarding – obvious or known symptoms of emergent and life-threatening conditions.

156.    These failures stem from the chronic unavailability of on-site physicians, failure to staff medical units with qualified professionals, financial incentives to avoid the costs of inmate prescription medications and off-site treatment, and a failure to train and supervise underqualified medical staff in the assessment and care of inmates with serious medical needs.

157.    After Ms. Turley's return from the hospital on August 4, the only medical personnel who made decisions related to her assessment and treatment was LPN Noel, who failed to return Ms. Turley to the emergency department when her symptoms worsened – despite a physician's explicit order to do so.

158.    LPN Noel also repeatedly refused to give Ms. Turley her prescribed medications – including an antibiotic – to address her obviously serious and deteriorating medical condition.

159.    Additionally, Turn Key has established practices of failing to adequately assess inmates with complex and serious medical needs, failing to train medical staff on what constitute alarming symptoms and when to report such symptoms to a physician, and

44

failing to send inmates with serious medical needs to an outside medical facility for adequate assessment and treatment.

160.   Turn Key and GCSO/Garvin County has an established policy, practice, and/or custom of allowing undertrained and under-supervised LPNs to, *de facto*, run the medical unit at the Jail.

161.   The healthcare delivery system at the Jail is nearly entirely overseen and implemented by LPNs, like LPN Noel, who have not been properly trained – and are not licensed to assess or diagnose a medical condition, prescribe medication or otherwise provide adequate healthcare in complex and emergent situations. When the LPN is not available, detention officers are forced to medically monitor inmates with serious medical conditions.

162.   This medical delivery "system" is facially unconstitutional and violates Oklahoma law.

163.   Consistent with this unconstitutional system, decisions related to the assessment and treatment of Ms. Turley were made by unsupervised LPNs and detention officers who repeatedly failed to refer Ms. Turley to a physician, mid-level provider, or even a registered nurse ("RN").

164.   Turn Key and the County's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

165.   Turn Key's corporate policies, practices, and customs, as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Turley.

166.   These other cases bear numerous similarities. Indeed, in most of the deaths and negative outcomes at jails in which Turn Key is the medical provider, there exist some variation of the following circumstances: 1) Detention staff and Turn Key employees ignoring or failing to address the symptoms and concerns reported to them; 2) non-medical professionals, including jailers or other inmates, pleading with Turn Key employees to further assess or treat inmates; 3) inmates begging detention staff and Turn Key employees to take them to the hospital; 4) inmates complaining of symptoms for hours on end; 5) inmates manifesting visible symptoms for hours on end; 6) Turn Key employees being aware of inmates' medical histories and ignoring symptoms related to those histories; 7) Detention staff and Turn Key employees delaying in getting inmates assessed by a physician, leading to their disabilities and deaths; 8) Detention staff and Turn Key employees delaying in hospitalizing inmates, leading to their disabilities and deaths; and 9) inmates with serious and emergent medical conditions being "assessed" and treated by unsupervised individuals with minimal and utterly inadequate medical training and licensure, such as LPNs or medical assistants.

167.   In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

168.   On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa

County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

169.    Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death. Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions – including hypertension, bipolar disorder, and hallucinations – continued to deteriorate.

170.    An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

171.    Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but ***the Turn Key physician laughed at Smith and told him he was faking.*** For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back –

paralyzed and unable to walk, bathe himself, or use the bathroom on his own. He was forced to lay in his own urine and feces because staff told Smith he was faking paralysis and refused to help him.

172.    In November of 2016, Turn Key staff disregarded, for days, the complaints and medical history of James Douglas Buchanan while he was an inmate in the Muskogee County Jail. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in jail, he deteriorated significantly and his <u>clinical</u> <u>deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u> until he was nearly completely quadriplegic.***

173.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions in response to his profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions. Instead, he was placed in a cell where he died within hours. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

174.    On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail. During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood

pressure) at the time and had been prescribed medication by his physician to treat the condition. During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

175.    During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

176.    Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

177.    Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

178.    By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

179.    At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and that his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

180.    ***Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.***

181.    Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, ***there is no evidence that she, or anyone else at TCSO/Turn Key, ever gave Mr. Phelps any medications during his time at the Jail.***

182.    On one occasion, when Mr. Phelps could not get off the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground. Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

183.    At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann. ***Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition.*** Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

184.    At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN"). APRN Martin noted that Plaintiff had a ***"3 day history of evolving stroke like symptoms."*** She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness

on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a hypertensive crisis that requires immediate consultation and assessment by a physician.

185.    Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019. Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment. Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage. Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

186.    From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of those medications. ***When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications*** for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

187.    In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as ***Turn Key and its employees ignored the***

***obvious and severe worsening of his condition***, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

188.    In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

189.    Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail. By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

190.    From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs, despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

191.    On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

192.    Mr. White died on July 30, 2022.

193.    April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider. Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

194.    Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

195.    Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

196.    In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY [sic] TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.

197.    Yet, Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

198.    After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to … she looks like a

skeleton." Captain Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that medical (in the Jail) wasn't providing her care enough."

199.    Another staff member told an investigator that Ms. Sullivan deteriorated "to a bag of bones."

200.    On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

201.    On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

202.    Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

203.    Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

204.    In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

205.    On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and expressed a belief that it might be associated with his back.

206.    On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the …floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing "the worst pain he had ever been in and he could not handle it."

207.    In response, Nurse Stehr called a Turn Key NP, whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and condition.

208.    On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

209.    Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

210.    After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

211.    Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

212.    On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, ***NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern,"*** "trouble breathing," or any "new symptoms or other concerns."

213.    On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Defendant Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood. Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous…in the toilet."

214.    ***In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."***

215.    ***Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.***

216.    On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new conditions, including difficulty breathing and persistent coughing.

217.    ***In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."***

218.    On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood-streaked sputum and had heartburn. ***Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.***

219.    On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the

side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

220.    ***Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.***

221.    Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

222.    No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

223.    Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

224.    The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

225.    Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

226.    On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

227.    Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

228.    Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

229.    Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. ***Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.***

230.    Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

231.    For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

232.    On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

233.    Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

234.    Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

235.    From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

236.    Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

237.    In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

238.    The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces, according to reports.

239.    Mr. Price's official cause of death was listed as "acute dehydration and malnutrition."

240.    For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

241.    On December 24, 2021, Dean Stith, a 55-year-old man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

242.    Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced – false reporting of a crime – were the result of symptoms of his dementia.

243.    During the book-in process, on December 25, 2021, at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

244.    Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

245.    On January 5, 2022, at approximately 4:29 p.m., Turn Key Nurse Practitioner Megan Rasor saw Mr. Stith for the purported purpose of "[hypertension] and wounds to BLE." NP Rasor charted that Mr. Stith was unable to recall his medication regimen and was "A&O [alert and oriented] to person and place only. Patient has 2+

pitting edema to BLE with multiple open areas…[1] Patient to wear compression hose but is noncompliant."

246.    On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

247.    Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

248.    On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

249.    On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. ***Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.***

250.    Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia. Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

---

[1]    Pitting edema is when a swollen part of your body has a dimple (or pit) after you press it for a few seconds. It can be a sign of a serious health issue, such as a blood clot, congestive heart failure, kidney disease, liver disease or *lung disease*. Nurse Lewis' note indicates that Mr. Stith had pitting edema in both legs.

251.    By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate indifference, **Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.**

252.    At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith "drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,[2] 2+ pitting edema to BLEs, and full body weakness." Nurse Lewis also noted that Mr. Stith was unable to urinate.

253.    Particularly when coupled with his worsening condition over a period of days, Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

254.    On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

---

[2]    A decrease in skin turgor is a late sign of dehydration.

255.    EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail **"health care staff are poor historians and are unsure of timeline."**

256.    The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection. Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

257.    Providers at St. John were unable to resuscitate Mr. Stith, who died shortly after his arrival.

258.    The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[3] due to complications of COVID-19; and 2) hypertensive atherosclerotic cardiovascular disease.

259.    Mr. Stith's Estate brought claims, pursuant to 42 U.S.C. § 1983, against the Tulsa County Sheriff, Turn Key, and Turn Key employees Sarah Lewis, LPN, and Rhonda Higler, APRN. On July 8, 2025, Judge John D. Russell denied the defendants' motions to dismiss. *See Crawford v. Turn Key Health Clinics, LLC, et al.,* 24-CV-6-JDR-SH (N.D. Okla.) at Doc. No. 48.

---

[3]     Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

260.    On December 8, 2022, after 11 days of extreme neglect during a mental health crisis, Shannon Hanchett died at the Cleveland County Jail under Turn Key's purported "care."

261.    On the evening of November 26, 2022, Ms. Hanchett was booked into jail while exhibiting obvious signs of a serious mental health episode. She was clearly confused, distressed, and suffering from delusions. Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

262.    A Turn Key LPN began the medical intake process with Ms. Hanchett, but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis. When she took Ms. Hanchett's vital signs, her blood pressure (143/89) and pulse (120 BPM) were both elevated.  The Turn Key LPN did not take any steps to address these alarming vital signs.

263.    After failing to complete the intake process, jail staff locked Ms. Hanchett in a tiny, insect-infested processing cell that had no sink, toilet, or bed. For the next 11 days, she was confined in these conditions and deprived of virtually all contact with other people. The lights were left on at all times, day and night, depriving her of any sleep.

264.    For periods of up to five days at a time, no one at the jail even opened the door of Ms. Hanchett's cell. Denied access to a toilet, she was forced to relieve herself on the floor and then lie in her own waste.

265.    Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration for days.

266.    Throughout this time, Turn Key staff were fully aware of Ms. Hanchett's horrific conditions of confinement and her escalating mental health crisis. Ms. Hanchett's cell was video-monitored, allowing staff to see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her tiny cell at all times. Despite observing that Ms. Hanchett had not been adequately eating and had been given nothing to drink for days, Turn Key staff failed to address these dangerous health risks or report them to a physician. Instead, they dragged her naked body across the floor and laughed at her inability to stand or walk just hours before her death.

267.    In February 2023, Joe Allen Sims, Jr., a mentally ill inmate who was supposed to be under "critical watch," died by suicide at the Cleveland County Jail. Mr. Sims was discovered by Jail staff 77 minutes after he hanged himself, despite the fact that he was supposed to be closely monitored due to his mental state.

268.    On June 19, 2022, 78-year-old Wade Womack was arrested and taken to the Canadian County Jail.

269.    Mr. Womack had a history of hypertension, kidney failure, and congestive heart failure which required him to have 13 stents and be on three different blood thinners. His medical history was reported during his intake and later confirmed by medical records sent to Turn Key.

270.    At the Canadian County Jail, Mr. Womack had pain and weakness throughout his body which caused him to fall multiple times and develop cuts and bruises across his body.

271.    Mr. Womack also had trouble swallowing, which made it difficult for him to take medications and prevented him from eating and drinking proper amounts.

272.    On June 26, 2022, Mr. Womack complained of sharp stabbing pain in the left side of his chest and was seen by only an LPN. Subsequently, he was not given any meaningful treatment, sent to a hospital, or seen by a physician or even a registered nurse.

273.    Upon information and belief, on July 3, 2022, an APRN placed an over the phone order instructing Jail medical staff to give Mr. Womack a nutritional shake twice per day, to crush his medication, and place him on a soft diet due to his issues chewing and swallowing. No further treatment was ordered, no appointment with a physician was scheduled, and no medical provider with more training than an LPN came to assess Mr. Womack.

274.    On July 6, 2022, the Canadian County District Court held a hearing regarding the State's Motion to Hold Without Bond in Mr. Womack's pending criminal case.

275.    At the hearing, Nurse Tina Hunt, LPN testified that between the time Mr. Womack was booked at the Jail and the date of the hearing, she had seen or treated Mr. Womack six or seven times.

276.    When asked **if the jail had "the necessary resources to house [Mr. Womack] and treat him for his condition," Nurse Hunt testified "No, ma'am."**

277.    Nurse Hunt further added that Mr. Womack had lots of open wounds and bruises that were not present before he was booked into the Jail and that Mr. Womack required "immediate medical care" and that he required care at a "long-term care facility."

278.    Captain Austin Moore, Deputy Jail Administrator of the Canadian County Jail, was also called as a witness at the same hearing. He testified that detention staff regularly had to assist Mr. Womack with basic activities such as getting him into his wheelchair, dressing him, helping him get to the toilet, and putting his adult diapers on.

279.    When asked if the Jail had the necessary resources to address Mr. Womack's serious medical conditions, Captain responded, "As far as full care, that is the recommendations of what Turn Key -- which is who we contract with as the jail to provide medical aid to the inmates -- *the recommendation is he needs full care. We don't have that ability.*"

280.    In her closing at the hearing, Mr. Womack's criminal defense attorney stated: "this is a hearing for [Mr. Womack's] bond, and as he stands right now, the charges don't carry the death penalty. However, *this 78-year-old man, if left in the custody of the Canadian County jail, due to his deteriorating health and the facility not being able to assist him with the treatment that he needs, he will die.*"

281.    The request for medical OR bond was denied, and Mr. Womack was returned to the Canadian County Jail where his condition continued to worsen and the low level of care he received remained the same. No member of the Jail or Jail medical staff arranged for Mr. Womack to be seen by a physician, PA, APRN, or RN.

282.    In the early hours of July 7, 2022, the day after the hearing, Mr. Womack was found in cardiac arrest in his cell. After being transported to the hospital, he was pronounced dead.

283.    Mr. Womack's Estate brought claims, pursuant to 42 U.S.C. § 1983, against the Sheriff of Canadian County, Turn Key, and three Turn Key nurses, Sally Miller, LPN, Ave Giovinco, LPN, and Tina Hunt, LPN, who were tasked with caring for Mr. Womack while he was housed at the Canadian County Jail.

284.    On February 20, 2025, Judge Patrick Wyrick accepted the Magistrate Judge's recommendation to deny Turn Key, Nurse Miller, Nurse Giovinco, and Nurse Hunt's motions to dismiss. *See Neal v. Sheriff of Canadian County*, 2025 WL 561420 (W.D. Okla. Feb. 20, 2025).

285.    In denying the motions to dismiss, Judge Wyrick held, found, and reasoned, in pertinent part:

> Plaintiff set forth ample facts asserting that Turn Key had a policy or custom of under staffing, under training, and under supervising, all driven by its cost-saving incentives. Specifically, Plaintiff alleges that in order to boost profits, Turn Key had a policy of under staffing its facilities such that it was impossible for the few physicians employed by Turn Key to supervise or provide required medical care to inmates within their care, leaving this responsibility to unqualified and under trained medical personnel…Plaintiff pleaded facts beyond Turn Key's desire to make a profit. Plaintiff pleaded sufficient facts to establish the first element of *Monell* liability.

> Moving to causation, Plaintiff has set forth facts demonstrating that Mr. Womack was solely cared for by LPNs employed by Turn Key who knew of his medical conditions, his medical history, his inability to take his required medications, and his rapidly deteriorating condition, but despite this knowledge, none of Turn Key's employees abided by their obligation to notify a physician or medical provider with more training of Mr. Womack's situation. Further, none of Turn Key's employees arranged for Mr. Womack

to be evaluated by a physician or taken to a hospital for treatment. And along with these allegations, Plaintiff has set forth facts plausibly suggesting that it was *because* of Turn Key's cost-cutting measures and policies to under train, under supervise, and under staff that this outcome resulted. Plaintiff has satisfied her burden of setting forth facts that plausibly suggest that Turn Key's policies caused Mr. Womack's injuries.

*Neal v. Sheriff of Canadian County,* 2025 WL 561420, at *8-9 (W.D. Okla. Feb. 20, 2025).

286.    On July 22, 2022, William Wimbley, a 64-year-old man, was booked into the McCurtain County Jail another facility that relied on Turn Key to provide medical services to its inmates.

287.    Mr. Wimbley informed Turn Key staff he suffered from multiple pre-existing cardiovascular problems including chronic hypertension and was prescribed several medications to treat these pre-existing conditions.

288.    For months, Mr. Wimbley complained that the McCurtain County Jail and Turn Key Staff were not properly controlling his blood pressure, but his pleas were ignored.

289.    On January 7, 2023, Mr. Wimbley experienced severe chest pains and was taken to a hospital where his blood pressure was measured at 226/124, which is an extreme and potentially deadly state of hypertension.

290.    Mr. Wimbley was stabilized and then returned to the McCurtain County Jail with discharge instructions that the jail adjust his medications to better control his hypertension and further instructions that Mr. Wimbley should follow up with a physician within 1-2 days and if his symptoms worsened, he should return to the ER.

291.    Two days later January 9, 2023, at the McCurtain County Jail, Mr. Wimbley again experienced chest pain and was in another hypertensive crisis with his blood pressure

measured at 186/121. Jailer Brittany Stockton called Turn Key APRN Becky Pata to inform her of Mr. Wimbley's condition.

292.    Contrary to the discharge instructions from the hospital, Mr. Wimbley was not taken back to the hospital or seen by a physician. Instead, Nurse Pata instructed jail staff to give .2mg of Clonidine and to do nothing further.

293.    For weeks, Mr. Wimbley's blood pressure was measured at levels consistent with a hypertensive crisis, but no steps were taken by the jail or Turn Key staff have Mr. Wimbley see a physician, return him to a hospital, or modify his treatment. Mr. Wimbley continued to experience chest pains and dangerous hypertension due to the jail and Turn Key's inaction.

294.    In early March 2023, Mr. Wimbley reported to both jail and Turn Key staff that he developed weakness and numbness in his left side, fatigue and additional pain.

295.    Throughout March 2023, Mr. Wimbley's health continued to deteriorate, and he pled to jail and Turn Key staff daily to be taken to the hospital but again and again his pleas for help were ignored.

296.    At the end of March/beginning of April 2023, Mr. Wimbley's condition severely worsened. He reported to jail and Turn Key staff that his left side weakness and numbness had gotten even worse, to the point that he struggled to walk. This too was ignored by jail and Turn Key staff.

297.    On April 5, 2023, Mr. Wimbley's condition deteriorated to the point that he lost control of his bowels and bladder and after months of indifference to Mr. Wimbley's suffering the jail and Turn Key staff finally sent Mr. Wimbley to a local hospital where it

was determined he had suffered a stroke. Eventually, Mr. Wimbley had to be life-flighted to OU Medical Center for additional treatment.

298.    In late April 2023, Mr. Wimbley was transferred to a rehabilitation hospital for several grueling weeks of physical therapy in an effort to restore strength and mobility to his left side.

299.    On February 19, 2022, China Bradley was booked into the Tulsa County Jail.

300.    Ms. Bradley was 24 years old and suffered from paranoid schizophrenia, bipolar disorder, anxiety, and dissociative identity disorder. Turn Key obtained her mental health records and prescription information.

301.    Three days after Ms. Bradley was booked into jail Turn Key started giving her Paroxetine and Aripiprazole, the mental health medications she was prescribed.

302.    Ms. Bradley was evaluated by multiple Turn Key employees who noted Ms. Bradley was suffering from many mental health related symptoms including delusions, hearing "voices," speaking to people/entities that were not there, and believing she was a male that was related to China Bradley.

303.    On March 22, 2022, Ms. Bradley was taken off Paroxetine and Aripiprazole and started on Risperidone, another drug that treats bipolar disorder and schizophrenia.

304.    By July 22, 2022, Ms. Bradley's already clearly poor mental state further deteriorated. She remained in her bed for most of every day and night, rarely went out for recreation time, and kept her cell in an unsanitary condition, with food, trash, and papers strewn around her cell.

305.    Ms. Bradley's condition continued to decline. On October 26, 2022, she was put on suicide watch. Ms. Bradley presented with delusions and flight of ideas which are symptoms associated with manic episodes and psychotic states.

306.    On December 7, 2022, Turn Key provider Judy Wagga observed Ms. Bradley trembling and Ms. Bradley was started on Benztropine Mesylate, a medication used to treat Parkinson's Disease.

307.    On or about December 16, 2022, Ms. Bradley reported that she felt sick and was throwing up. Additionally, a Turn Key licensed professional counselor noticed Ms. Bradley moved her mattress to the floor of her cell.

308.    Over the next couple of days Ms. Bradley experienced symptoms of a serious medical condition including feeling faint/fatigued and her vision would randomly become blurry.

309.    Ms. Bradley also stopped eating regularly and spent almost every minute of the day lying naked on the floor of her cell, rarely responding to anyone instead responding primarily to internal stimuli.

310.    On December 21, 2022, Ms. Bradley, still experiencing these symptoms, fell in the showed and developed a golf ball-sized "goose egg" on her forehead. She was not sent to the hospital or seen by a physician. Ms. Bradley's psychotic symptoms worsened, and she refused or was unable to engage with mental health professionals. From then on Ms. Bradley experienced great difficulty walking or standing by herself without falling.

311.    On December 23, 2022, Ms. Bradley, likely after another fall, was found lying on the floor of her cell unresponsive with no pupil response and bleeding from her left eye. Two hours after being found she was transported to the emergency room.

312.    At the emergency room, blood tests showed Ms. Bradley was suffering from a buildup of lactic acid in her blood and severe potassium deficiency which can cause severe muscle weakness, low blood pressure, lightheadedness or faintness, abnormal heart rhythms, or even respiratory failure.

313.    Ms. Bradley was treated with IV fluids and discharged from the hospital the next day. Upon discharge her discharge, emergency room providers warned that if Ms. Bradley experienced new or worsening symptoms, she should return to the ER immediately for further care.

314.    After Ms. Bradley returned to the jail where Turn Key APRN Judy Wagga, who was not onsite, ordered injections of Haldol and Benadryl which slowed Ms. Bradley's breathing. Both medications were inappropriate and unnecessary. Haldol was especially dangerous because it is contraindicated for those at risk for certain heart problems, including people with low potassium like Ms. Bradley.

315.    Throughout December 24 and 25, 2022, multiple Turn Key providers saw Ms. Bradley lying naked on the floor of her cell, unable to stand or walk, unresponsive to verbal stimuli and with deliberate indifference to her serious medical needs left her.

316.    At approximately 5:00 p.m. on December 25, 2022, Turn Key nurse Lyric Brooks, LPN encountered Ms. Bradley during pill pass. Nurse Brooks observed Ms. Bradley in the same emergent state she'd been in for the previous several hours and days: lying

naked on the floor of her cell not responsive to verbal stimuli. By this point, Ms. Bradley had been lying naked on the floor of her cell, catatonic, for the approximately 28 hours, ignored by the few members of the Jail  and Jail medical personnel who were staffed on Christmas, despite her obviously emergent medical and mental health conditions.

317.    Nurse Brooks called a Turn Key Charge Nurse to notify them about Ms. Bradley's obviously emergent condition. The Charge Nurse responded that Ms. Bradley's condition was normal and she'd been in that same state since she returned from St. John.

318.    Both Nurse Brooks and a TCSO deputy told the Charge Nurse that Ms. Bradley's condition was *not* normal based on their knowledge of Ms. Bradley's typical state and demeanor from previous interactions with her at the Jail.

319.    Upon information and belief, the Charge Nurse reluctantly came to Ms. Bradley's cell to "assess" her and brushed off Nurse Brooks' and the deputy's concern, callously stating that Ms. Bradley was fine.

320.    Still alarmed at Ms. Bradley's obviously dire condition, Nurse Brooks tried to get in contact with someone in the Mental Health department at the Jail, but no one answered due to the understaffing on Christmas.

321.    At 7:30 p.m. on December 25, 2022, Ms. Bradley was unresponsive to even a sternal rub. A nurse was called to her cell where it was observed that Ms. Bradley's respirations were shallow and she was clearly near death.

322.    An ambulance was called to take Ms. Bradley to the hospital where she was later pronounced dead at the age of 25.

323.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates – with obvious, serious and emergent medical and mental health conditions – was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

324.    By its design, the Turn Key medical system was destined to fail.

325.    At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key. In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

326.    In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to the dozens of jails staffed by Turn Key for short blocks of time each week. This constitutes plainly inadequate medical staffing.

327.    With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training and licensure.

328.    In other words, Turn Key had a policy, practice, or custom of inadequately staffing county jails, including the Garvin County Jail, with undertrained and

underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor, or treat inmates, like Ms. Turley, with serious medical needs.

329.    With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be minimized – even when doing so put inmates' lives at risk.

330.    This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious, and life-threatening medical conditions, like Ms. Turley, at substantial risk of harm.

331.    This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

332.    GCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Ms. Turley at excessive risk of harm. However, GCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Ms. Turley.

333.    Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

334.    This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

76

335.    Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Ms. Turley.

336.    There is an affirmative link between the aforementioned unconstitutional acts and/or omissions Turn Key staff, including of LPN Noel, and the policies, practices, and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

337.    When Ms. Turley arrived at the Garvin County Detention Center on August 4, 2023, a physician had given explicit instructions for monitoring and caring for her. Turn Key staff were aware that the physician had noted that "[p]ain can be a serious problem requiring surgery" and had instructed that "***should she have any new or worsening symptoms, to return her to the emergency department***... Patient have close follow-up with the surgery clinic or sooner with the emergency department for any new or worsening symptoms." Turn Key staff were also aware that Ms. Turley had been prescribed an antibiotic to combat a possible infection. Following her arrival at the Jail on August 4, Ms. Turley's symptoms worsened significantly. With deliberate indifference to her serious medical needs, neither LPN Noel nor any other Turn Key employee/agent adequately treated Ms. Turley's symptoms and conditions. Even after her health deteriorated to the point that she was completely incoherent, was not eating or drinking, could not stand or sit up under her own power, and spent hours every day constantly moaning in pain, she was kept at the Jail for an extended period of time, when it was obvious she needed a higher level of care. This was callous and reckless indifference.

338.    It was obvious that Ms. Turley's conditions could not be effectively treated in a correctional setting. Yet, despite the obvious and excessive risks to her health and safety, Turn Key personnel, including LPN Noel, refused to send her to the hospital or other facility with a higher level of care.

339.    Even if no single Turn Key employee/agent had violated Ms. Turley's constitutional rights, Turn Key would still be liable under a theory of a systemic failure of its policies and procedures as described herein. There were such gross deficiencies in the medical delivery system at the Jail that Ms. Turley was effectively denied constitutional medical care.

340.    Counties may be held liable for the maintenance of unconstitutional health care delivery systems. In *Burke v. Regalado,* 935 F.3d 960 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care, and indifference toward medical needs at the Tulsa County Jail. *See Burke,* 935 F.3d at 999-1001.[4]

---

[4]    *See also v. Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020) (finding that a county may face liability based on "theory [of] systemic failure of medical policies and procedures"); *Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams." (emphasis added)).

341.    As evidenced, *supra*, the Jail/GCSO/the County have maintained an unconstitutional health care delivery system.

342.    Indeed, simply by retaining Turn Key as the medical provider at the Jail despite the obviously substandard care that Turn Key has provided – and continues to provide – to inmates at the Garvin County Jail and county jails all over Oklahoma, Arkansas, and Kansas, GCSO/the County are deliberately indifferent to inmates' serious medical needs.

343.    GCSO/the County are aware, or should be aware[5], of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet GCSO/the County have made the conscious decision to retain Turn Key as Garvin County Jail's medical provider.

344.    GCSO/the County were also aware that Turn Key was providing "medical care" at the Jail through a lone and unsupervised LPN – a minimally trained nurse who by law cannot diagnose or treat illnesses. As a matter of Oklahoma law, LPNs must be supervised by a physician or RN and cannot independently assess or evaluate patients. Under the medical delivery system at the Jail, the LPN practiced without clinical supervision. Consistent with Turn Key and GCSO/the County's unconstitutional system, in the two days following Ms. Turley's return to the hospital on August 4, as her condition

---

[5] The negative medical outcomes discussed, *supra*, at jails in which Turn Key is the medical provider, have garnered substantial media attention. Further, upon information and belief, when Turn Key submits a response to a county's request for proposal ("RFP") when it is vying to become the jail's medical provider, Turn Key discloses a list of the current and previous lawsuits against it in which inmates, or inmates' estates, have alleged constitutionally inadequate medical care.

deteriorated alarmingly, she was not seen by a single qualified medical professional – despite a hospital physician's explicit warning that Ms. Turley might have a serious medical condition and should be monitored carefully for worsening symptoms.

345.    In addition, GCSO/the County have shown deliberate indifference to the health and safety of inmates by utterly failing to train its detention staff in how to properly monitor, supervise, or care for inmates, like Ms. Turley, with serious medical needs.

346.    With deliberate indifference to the serious medical needs of inmates, GCSO/the County also maintained a policy, practice, or custom of not calling an ambulance – even when an inmate is showing obviously emergent, possibly fatal symptoms – unless and until Turn Key's LPN authorized it.

347.    After Ms. Turley returned to the Garvin County Jail following her August 4 hospital visit, multiple Jail staff members watched her die a slow, grueling death. A hospital physician had explicitly told them that "[p]ain can mean a serious problem requiring surgery." The physician had repeatedly emphasized the importance of watching Ms. Turley closely, emphasizing that "***should she have any new or worsening symptoms, to return her to the emergency department***..." (emphasis added). Jail staff knew Ms. Turley had a possible infection and had been prescribed an antibiotic to protect against it – medication she was supposed to receive twice each day. Jail staff knew that Ms. Turley's condition worsened steeply after her return from the hospital and continued to deteriorate over the next 48 hours. They knew that although she had been able to walk under her own power at the hospital, after returning to the Jail she could not walk without assistance. They knew her pain continued to worsen, to the point that she was

constantly crying out in pain. They knew that, as the hours passed and her condition grew worse, she became unable to control her bowels and repeatedly defecated on herself. Yet throughout this period, Jail staff demonstrated deliberate indifference continually. Not one of them called an ambulance. Not one of them showed any indication that they saw a problem with how she was treated. On the contrary, they refused to give her food or her prescribed antibiotic – an extraordinarily simple intervention that could have saved her life – simply because she was incapable of standing up to get them. And they even persuaded Ms. Turley's fellow inmates that she was faking her condition, and then allowed – and even enabled – those inmates to abuse Ms. Turley because they thought she was malingering.

348.    It is clear from the Jail surveillance video that this was just like any another day at the Garvin County Jail. The Jail has a deeply entrenched custom and practice of deliberate indifference.

349.    An inspection conducted by the Oklahoma State Department of Health in July 2021 found that jailers repeatedly failed to perform visual sight checks hourly as required, sometimes going as long as 4 hours between sight checks. That same inspection found that Cell #8 (among others) was overcrowded, in violation of state standards. The Department found that Cell #8 had "a maximum capacity of ten person," yet at the time of inspection it housed 15 inmates. Two years later, when Ms. Turley was an inmate at the Jail, the County had done nothing to resolve this issue. Cell #8 contained 16 bunk beds and held 14 inmates when Ms. Turley was housed there. On information and belief, this overcrowding contributed to the abuse Ms. Turley faced at the hands of her fellow inmates,

who grew angry at being confined in a small space with a person who was defecating on herself and moaning incessantly.

350.    Another inspection by the Oklahoma State Department of Health in February 2023 – just six months before Ms. Turley's time at the Garvin County Jail – found that the Jail was violating State standards governing dispensing and documentation of medications given to each resident. The inspection found that "the facility failed to provide a written policy and procedure to assure safety in dispensing and documentation of medications given to each resident. ***The facilities [sic] medical provider failed to ensure the dispensing of medications…***"

351.    Upon information and belief, despite knowing of these failures and the serious risks they posed to inmates' health, GCSO/the County failed to ensure that the Jail was properly staffed, jailers were adequately trained, and that jailers properly dispensed medications to inmates – particularly to inmates, like Ms. Turley, who had serious medical needs and required close monitoring.

352.    The County/GCSO's failure to take reasonable measures to alleviate known and substantial risks to inmates like Ms. Turley constitutes deliberate indifference at the municipal level.

**CAUSES OF ACTION**

**VIOLATION OF THE EIGHTH AND/OR FOURTEETH**
**AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**
**(42 U.S.C. § 1983)**

353.    All preceding paragraphs are incorporated herein by reference.

## A. Individual Liability and Underlying Violation of Constitutional Rights

354. Ms. Turley had obvious, severe, and emergent medical needs made known to GCSO/the County and Turn Key, including Defendants Noel, Baxter, Melton, Ingram, Kelley, and Matthews, prior to her death.

355. Nonetheless, GCSO/the County and Turn Key, including Defendants Noel, Baxter, Melton, Ingram, Kelley, and Matthews, disregarded the known and obvious risks to Ms. Turley's health and safety.

356. As described *supra*, Ms. Turley had serious and emergent medical issues that were known and obvious to the Turn Key/GCSO employees/agents. It was obvious that Ms. Turley needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed, and obstructed. Turn Key/GCSO employees/agents, including Defendants Noel, Baxter, Melton, Ingram, Kelley, and Matthews, disregarded the known, obvious, and substantial risks to Ms. Turley's health and safety.

357. With deliberate indifference to her serious medical needs, health, and safety, Defendants failed to provide Ms. Turley with, *inter alia*, timely or adequate medical treatment; proper monitoring and supervision; or reasonable access to outside medical providers who were qualified and capable of evaluating and treating her while she was placed under their care.

358. As a direct proximate result of the unlawful conduct of Jail and Turn Key staff, including Defendants Noel, Baxter, Melton, Ingram, Kelley, and Matthews, Ms.

Turley suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, loss of familial relationships, and death.

### B.    Municipal Liability (Against Turn Key)

359.    All preceding paragraphs are incorporated herein by reference.

360.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.

361.    At all times pertinent hereto, Turn Key was acting under color of State law.

362.    Turn Key has been endowed by Garvin County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

363.    Turn Key is charged with implementing and assisting in developing the policies of GCSO with respect to the medical care of inmates at the Garvin County Jail and has shared responsibility to adequately train and supervise its employees.

364.    In addition, Turn Key implements, maintains, and imposes its own corporate policies, practices, protocols, and customs at the Jail.

365.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Ms. Turley's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

366.    To the extent that no single officer or professional violated Ms. Turley's constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and procedures as described herein. There were such gross deficiencies in medical

procedures, staffing, facilities, and procedures that Ms. Turley was effectively denied constitutional conditions of confinement.

367.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices, and/or customs posed substantial risks to the health and safety of inmates like Ms. Turley. Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Ms. Turley's, serious medical needs.

368.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

369.    Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Garvin County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985).

370.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

**C. Official Capacity Liability (Against Defendant Sheriff)**

371.    All preceding paragraphs are incorporated herein by reference.

372.    The aforementioned acts and/or omissions of GCSO and/or Turn Key staff in being deliberately indifferent to Ms. Turley's health and safety and violating Ms. Turley's civil rights are causally connected with customs, practices, and policies which the

Sheriff/County/GCSO promulgated, created, implemented, and/or possessed responsibility for, as described herein.

373.    The Sheriff/County/GCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices – in spite of their known and obvious inadequacies and dangers – has been deliberately indifferent to inmates', including Ms. Turley's, health and safety.

374.    The Sheriff/County/GCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985).

375.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Turley suffered injuries and damages as alleged herein.

376.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant her the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for Defendants Turn Key's and Noel's reckless disregard of Ms. Turley's federally protected rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

**Attorneys for Plaintiff**